**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **3:25-cr-00088** |
| | : | |
| **v.** | : | **(Mariani, J.)** |
| | : | |
| **JOHN DURKIN** | : | **(ECF)** |

**SENTENCING MEMORANDUM**

On August 28, 2025, defendant John Durkin entered a plea of guilty to a charge of being an unlawful drug user/addict in possession of a firearm (18 U.S.C. § 922(g)(3)). The Court has scheduled a sentencing hearing for January 30, 2026. As calculated in the Presentence Investigation Report, the Guidelines recommend imposition of a term of imprisonment of 57-71 months; by plea agreement, the government will recommend a sentence no greater than the bottom of the applicable guideline range. PSR ¶ 69.

•

The Court should impose a significantly less severe sentence considering Mr. Durkin's history and characteristics. Durkin is age 52 and a lifelong resident of Luzerne County. PSR ¶¶ 32, 36. He is a high school graduate who (although it is not noted in the PSR) also obtained his CDL through Bloomsburg University in 2009. His employment

history is substantial (although hindered since 2024 by a work-related injury to both feet caused by 10-foot fall from a ladder). PSR ¶¶ 39, 48-63. His criminal history is, by contrast, insubstantial — two convictions during his lifetime, only one recent enough to count for a point under the Guidelines, placing him in the category of offenders with the least significant criminal history, Category I. PSR ¶¶ 27-29. He has, however, experienced trauma and battled mental health disorders (bi-polar disorder, generally anxiety disorder, PTSD) and drug addiction throughout his adult life, a battle he was losing at the time he committed the instant offense (see below). PSR ¶¶ 33, 40-44. Since the time of his arrest in relation to the instant offense, however, Durkin has accepted responsibility, and he successfully completed inpatient substance abuse treatment in May 2025. Then he moved into a sober home and continued treatment (involving therapy and medication) on an outpatient basis. PSR ¶¶ 36, 45-46. He has the love and support of his family, and the letters that will be submitted to the Court attest to his good character and contributions to the lives of others.

The nature and circumstances of the offense also weigh in favor of a significantly less severe sentence. The drugs and paraphernalia found

in Durkin's possession at the time of his firearm offense was more consistent with drug use than drug dealing. The drugs he possessed were "three grams of methamphetamine" and "a personal-use amount of marijuana." PSR ¶ 8. Yet based on his subsequent statement to officers that he likely "would have used like a gram-and-a-half, maybe half of it" and given the rest to others who "use[d] together" with him, the PSR deems him a distributor, a status that adds 20 months of imprisonment (four offense levels) to the bottom end of his guideline range. PSR ¶ 17. And although Durkin's possession of a KelTec Sub-2000 9 mm was highly fortuitous (see discussion below), the PSR deems the gun stolen and applies sentencing enhancements related to the unregistered/un-serialized (homemade) silencer that was attached to the KelTec,[1] enhancements that add at least 27 months of imprisonment (10 offense levels) to the bottom end of his guideline range. PSR ¶¶ 15-16. Durkin's guideline range would be imprisonment for 10-16 months in the absence of the enhancements. Even if the Court holds that the enhancements

[1] The silencer was highly ineffective. ATF testing found it reduced the decibels associated with firing from 152.60 to 137.29, an approximately 10% reduction. It is counsel's understanding that, with the silencer attached, the volume of the firing of the KelTec would have fallen somewhere between exploding fireworks and a jackhammer.

properly apply, the Court should vary downward from the guideline range to account for the aforementioned circumstances of Durkin's offense conduct, in light of which the guideline range is excessively harsh.

•

These aforementioned factors should guide the Court's ultimate fashioning of a sentence that is sufficient but not greater than necessary under §3553(a)(2), regardless of the sentencing range recommended by the Guidelines. But preliminarily, the sentencing range recommended by the Guidelines should be lower, for three reasons:

*First*, the Court should hold Durkin did not possess a "*firearm* that is described in 26 U.S.C. §5845(a)," USSG §2K2.1(a)(4)(B) (emphasis added), a holding that would reduce Durkin's USSG offense level by at least eight levels. The PSR claims otherwise (PSR ¶ 15 & Addendum) because Durkin possessed the silencer attached to the KelTec, and one of the items described in 26 U.S.C. §5845(a) is a "silencer (as defined in section 921 of title 18, United States Code)." But, for the reasons explained below, "*firearm*" should be given its ordinary meaning — according to which a silencer is not a firearm — in §2K2.1, not the meaning given in the application notes for USSG §2K2.1. Accordingly,

Durkin did not possess a *firearm* (as ordinarily defined) that is described in 26 U.S.C. §5845(a).[2]

The application notes for USSG §2K2.1 instruct "'firearm' has the meaning given that term in 18 U.S.C. §921(a)(3), unless otherwise specified." USSG §2K2.1, comment. (n.1). And §921(a)(3) includes "any firearm muffler or firearm silencer" in its definition of "firearm."

But the application notes should not come into play here. In *United States v. Adair*, 38 F.4th 341 (3d Cir. 2022), the Court of Appeals confirmed that only in the case of a genuinely ambiguous guideline may an application note be relied upon for interpretation. So before any reliance may be placed upon USSG §2K2.1's application notes, the process "starts with conducting [a] genuine-ambiguity analysis using the traditional tools of construction to examine the text, structure, purpose, and history" of the guideline at issue. *Adair*, 38 F.4th at 350. If there is

---

[2] 26 U.S.C. § 5845(a) describes eight items, some of which are firearms as ordinarily defined (*e.g.*, "a shotgun having a barrel or barrels of less than 18 inches in length"), some of which are not ("any silencer (as defined in section 921 of title 18, United States Code)"). Importantly, USSG §2K2.1(a)(4)(B) does *not* by its terms apply to a 'firearm *as defined in* 26 U.S.C. § 5845(a),' but rather any "firearm *that is described in* 26 U.S.C. § 5845(a)," where *firearm* should take its ordinary meaning. The provision would apply to a defendant who possessed an item that is *both* a firearm (as ordinarily defined) and described in §5845(a).

no genuine ambiguity, then the court must apply the guideline without reference to the commentary.[3]

Starting with the text of USSG §2K2.1, the Court must "assume that words carry their ordinary meaning." *United States v. Josey*, 155 F.4th 234, 241 (3d Cir. 2025). And the ordinary meaning of "firearm" does not encompass silencers. As Justice Thomas has observed in the context of a discussion of 18 U.S.C. § 921(a)(3), "Congress broadly defined the term 'firearm' to include objects—like frames and silencers—that fall outside that term's ordinary meaning." *Bondi v. VanDerStok*, 604 U.S. 458, 510 n.10 (Thomas, J., dissenting).

With respect to structure and purpose, USSG §2K2.1 is compatible with the ordinary meaning of "firearm." The guideline effectively divides defendants to whom it applies into two categories — (1) those whose offenses involved firearms (as ordinarily defined) with no distinguishing features or whose offenses did not involve a firearm (as ordinarily defined) at all but are nevertheless tied to the guideline (e.g., a person whose offense involves a silencer, ammunition, etc.); and (2) those whose

[3] Adair prescribes additional analytical steps before sanctioning reliance on an application note, even when a guideline is genuinely ambiguous. *See United States v. Josey*, 155 F.4th 234, 240 (3d Cir. 2025).

offenses involved firearms (as ordinarily defined) with distinguishing features (*e.g.*, a firearm "capable of accepting a large capacity magazine" or a firearm "described in 26 U.S.C. § 5845(a)"). With respect to history, the text of USSG §2K2.1 has never included a definition of "firearm." As of 1988, the commentary associated with USSG §1B1.1 (defining "terms that are used frequently in the guidelines") defined "firearm" at n.1.(e) much closer to its ordinary meaning, as "any weapon which is designed to or may readily be converted to expel any projectile by the action of an explosive." By 1989, however, the commentary associated with USSG §2K2.1 incorporated the definition of "firearm" from 18 U.S.C. § 921(a)(3) for violations of 18 U.S.C. 922(g), noting the definition was "somewhat broader than that used in Application Note 1(e)." By 1991, the commentary associated with USSG §2K2.1 extended definition from § 921(a)(3) to all uses of "firearm" in the guideline.[4]

These changes to the definition of "firearm" in the commentary to USSG §2K2.1 did not clarify an ambiguity in the guideline or the meaning of "firearm." Rather, they expanded the definition of the term to

[4] Archived additions of the Guidelines are available from the United States Sentencing Commission's website, https://www.ussc.gov/.

encompass more conduct than allowed by the unambiguous text, structure, and purpose of the guideline. Accordingly, the Court should reduce Durkin's Base Offense Level from 20 (§2K2.1(a)(4)(B)) to 14 (§2K2.1(a)(6)). And the Court should not apply the 4-level enhancement that applies when a defendant "knew that any firearm involved in the offense was not otherwise marked with a serial number (other than a firearm manufactured prior to the effective date of the Gun Control Act of 1968) or was willfully blind to or consciously avoided knowledge of such fact." §2K2.1(b)(4)(B)(ii). Indeed, even assuming (*arguendo*) a silencer is a "firearm" under §2K2.1, there is insufficient evidence that Durkin would have known, been willfully blind to, or consciously avoided knowledge of the silencer's lack of a serial number, inasmuch as there is no evidence he knew that a silencer is a "firearm" that would need to carry such a serial number, and the KelTec itself had a serial number.

*Second*, the Court should sustain Durkin's objection to the 2-level increase under USSG § 2K2.1(b)(4) (which applies if any firearm was stolen). There is insufficient evidence that Durkin engaged in the "wrongful taking and removing of another's personal property with the intent of depriving the true owner of it." THEFT, Black's Law Dictionary

(12th ed. 2024). Durkin explained to officers that, at the time of the accident that led to his arrest, he was on his way "to take that gun back" to where it had come from (*i.e.,* to Tom, a friend of Durkin's). Durkin explained he had previously taken the gun from the Tom's home (where Durkin had rented a room) when he suspected other individuals at the owner's residence were going to misuse or steal the KelTec. He further explained he "called him [Tom] and told him I had it [the gun]." After reviewing the contents of Durkin's phone, an officer told his fellow officers, "the thing with Tom appears to be true . . . . "

*Third*, the Court should sustain Durkin' objection to the 4-level increase under USSG § 2K2.1(b)(7)(B) (for possession of a firearm in connection with another felony offense). As alluded to above, there is insufficient evidence to prove Durkin possessed drugs with the intent to distribute them at the time he possessed the. Recognition of habitual past practice and future likelihood is not the same as *intent*. Durkin explained to officers that he habitually gave others methamphetamine when he was using the drug in the company of others— "I just usually give the them a quarter-gram, and we use together, and then people go on their ways…" Asked whether he sold methamphetamine, he explained that "people

sometimes, they put gas in my car, give me a ride somewhere… stuff like that." Although Durkin told officers that, of the three grams of methamphetamine officers seized, he likely "would have used like a gram-and-a-half, maybe half of it" and given the rest to other users, he lacked the definite intent to distribute drugs necessary for guilt of PWID. Accordingly, The Court should sustain Durkin' objection to the 4-level increase under USSG § 2K2.1(b)(7)(B)

## CONCLUSION

Thank you for your consideration of these matters.

Respectfully submitted,

Date: January 20, 2026

s/ Elliot A. Smith
Elliot A. Smith
Assistant Federal Public Defender
Attorney ID No. NY 5073275

201 Lackawanna Avenue, Suite 317
Scranton, Pennsylvania 18503
(570) 343-6285
Fax: (570) 343-6225
Email: elliot_a_smith@fd.org

Attorney for John Durkin

**CERTIFICATE OF SERVICE**

I, Elliot A. Smith, Assistant Federal Public Defender, do hereby certify that this document will be sent to the following via ECF:

James M. Buchanan
Assistant United States Attorney

and sent to the defendant by placing the same in the United States mail, first class, postage prepaid, at Scranton, Pennsylvania, addressed to the following:

John Durkin

Date: January 20, 2026

s/ Elliot A. Smith
Elliot A. Smith
Assistant Federal Public Defender